## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Wordsworth Academy, | : | Case No. 17-14463 (AMC) |
| | : | |
| Debtor. | : | (Joint Administration Requested) |
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| Wordsworth CUA 5, LLC, | : | Case No. 17- 14466 (AMC) |
| | : | |
| Debtor. | : | (Joint Administration Requested) |
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| Wordsworth CUA 10, LLC, | : | Case No. 17- 14467 (AMC) |
| | : | |
| Debtor.[1] | : | (Joint Administration Requested) |
| | : | |

### INTERIM ORDER PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 362, 363 AND 364 AND RULES 2002, 4001 AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (1) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) AUTHORIZING THEM TO ENTER INTO THE DIP CREDIT AGREEMENT, (III) GRANTING LIENS AND ADMINISTRATIVE PRIORITY CLAIMS TO DIP LENDER, (IV) MODIFYING THE AUTOMATIC STAY, AND (V) SCHEDULING A FINAL HEARING

Upon the motion (the "*Motion*")[2] of the above-captioned debtors and debtors-in-possession (the "*Debtors*" or the "*Borrower*") (a) for the entry of this Interim Order (the "*Interim Order*") and the Final Order (the "*Final Order*") authorizing the Debtors to (i) obtain loans and advances and other financial accommodations in an aggregate principal amount not to

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  Wordsworth Academy (9031); Wordsworth CUA 5, LLC (0983); and Wordsworth CUA 10, LLC (5980). Wordsworth Academy has an address at 3300 Henry Ave., Philadelphia, PA 19129.

[2] Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.

1

exceed $1,500,000 (the "***DIP Facility***" or "***DIP Loans***") pursuant to sections 363 and 364 of title

11 of the United States Code (the "***Bankruptcy Code***") by entering into a debtor in possession

credit agreement (the "***DIP Credit Agreement***"), substantially in the form annexed to the Motion

as **Exhibit B**, among the Debtors and Learn and Play, Inc. t/a Play and Learn (the "***DIP

Lender***"), and Public Health Management Corporation as guarantor of the timely repayment of

the DIP Loans, (ii) execute and enter into the DIP Credit Agreement and the agreements and

instruments contemplated thereby and to perform such other and further acts as may be required

in connection with the DIP Credit Agreement, (iii) grant administrative priority claims to the DIP

Lender in accordance with the DIP Credit Agreement, this Interim Order, and the Final Order to

secure any and all of the DIP Obligations (as defined herein), and (iv) pending a final hearing on

the Motion (the "***Final Hearing***"), obtain emergency funding under the DIP Credit Agreement to

and including the date on which the Final Order is entered (the "***Interim Facility***"), (b)

requesting modification of the automatic stay imposed under section 362 of the Bankruptcy Code

to the extent necessary to permit the Debtors and the DIP Lender to implement the terms of this

Interim Order and the Final Order, (c) in accordance with Rule 4001(c) of the Federal Rules of

Bankruptcy Procedure (the "***Bankruptcy Rules***"), requesting that this Court (the "***Bankruptcy

Court***") schedule the final hearing (the "***Final Hearing***") for the entry of a Final Order on the

Motion to be held within twenty-eight (28) days after the entry of this order (the "***Interim

Order***"), and (d) requesting, pursuant to Rule 4001 of the Bankruptcy Rules, that an emergency

interim hearing on the Motion (the "***Interim Hearing***") be held for the Court to consider entry of

this Interim Order, which authorizes the Debtors to borrow funds under the DIP Credit

Agreement, on an interim basis, up to an aggregate principal amount not to exceed $1,000,000

(the "***Interim Amount***"); and the Court having considered the Motion and the exhibits attached

thereto, including, without limitation, the DIP Credit Agreement; and the Interim Hearing having been held and concluded; and upon all of the pleadings filed with the Court, all evidence presented in support of this Interim Order, and all of the proceedings held before the Court; and after due deliberation and consideration and good and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS**:

1.        On June 30, 2017 (the "***Petition Date***"), the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

2.        The Debtors are continuing in the management and possession of their business and properties as a debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.        This Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.        Notice of the relief sought by the Motion and the Interim Hearing was delivered via facsimile, electronic mail, and/or overnight delivery to the following: (a) the Office of the United States Trustee for the Eastern District of Pennsylvania; (b) the Commonwealth of Pennsylvania, Department of Labor and Industry; (c) the Commonwealth of Pennsylvania, Department of Revenue; (d) the Office of the Attorney General of Pennsylvania; (e) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (f) the Internal Revenue Service; (g) the City of Philadelphia; (h) M&T Bank; (i) Play and Learn; and (j) all parties who have requested notice pursuant to Bankruptcy Rule 2002.  Given the nature of the relief sought in the Motion, the Court

119665724_1

concludes that the foregoing notice was sufficient and adequate under the circumstances and complies with Bankruptcy Rules 2002 and 4001 in all respects for purposes of entering this Interim Order.

5.    The Debtors acknowledge, admit, and confirm the following as of the Petition Date:

6.    An immediate and critical need exists for the Debtors to obtain funds and use cash collateral to continue the operation of its business.  However, the use of "cash collateral," as defined by section 363(a) of the Bankruptcy Code and including any and all prepetition and, subject to section 552 of the Bankruptcy Code, postpetition proceeds of the Prepetition Collateral ("***Cash Collateral***"), alone would be insufficient to meet the Debtors' immediate post-petition liquidity needs.[3]

7.    The Debtors are unable to obtain the required funds on terms more favorable than those offered by the DIP Lender under the DIP Credit Agreement, this Interim Order, the Final Order and all other agreements, documents, notes and instruments executed and delivered pursuant hereto or thereto or in connection herewith or therewith (collectively with the DIP Credit Agreement, this Interim Order and the Final Order, the "***Post-petition Financing Documents***").

8.    The Debtors have requested that, pursuant to the terms of the Post-petition Financing Documents, the DIP Lender make loans and advances and provide other financial accommodations to the Debtors to be used by the Debtors solely in accordance with the terms of the Post-petition Financing Documents.  The ability of the Debtors to continue their business and reorganize under chapter 11 of the Bankruptcy Code depends upon the Debtors obtaining such

---

[3] The Debtors are separately filing a motion for authority to use cash collateral with respect to M&T Bank.

4

financing.  The Debtors will suffer immediate and irreparable harm if the requested post-petition

financing is not available on an interim and/or final basis.

9.      The DIP Lender is unwilling to extend the DIP Facility on an administrative

priority claim basis, as more particularly described herein, pursuant to the terms and conditions

of the Post-petition Financing Documents.  The Debtors' entry into the Post-petition Financing

Documents is fair and reasonable and is a sound exercise of their business judgment consistent

with their respective fiduciary duties.  The Post-petition Financing Documents were negotiated at

arm's length and in good faith between the Debtors and the DIP Lender, and the loans and

extensions of credit provided for in the Post-petition Financing Documents constitute reasonably

equivalent value and fair consideration.  Accordingly, the relief requested in the Motion is

necessary, essential, and appropriate for the continued operation of the Debtors' business, the

management and preservation of their assets and property, and to avoid irreparable harm to the

Debtors, their business, their estates, and parties in interest, including children within their care,

and is therefore in the best interests of the Debtors and their estates, creditors, and parties in

interest.

10.      The DIP Credit Agreement provides for various customary Events of Default (as

defined therein), including, failure to make payments when due; breach of certain covenants;

breach of warranty; other defaults under Loan Documents; dissolution or cessation of business;

dismissal of the bankruptcy case or conversion to a chapter 7 case; appointment of a chapter 11

trustee; appointment of an examiner with enlarged powers relating to the operation of the

business of the Debtors; Financing Order reversed, stayed or rescinded or amended or

supplemented by the Court without written consent of the DIP Lender; attempts by the Debtors

to obtain an order of the Bankruptcy Court or other judgment, which would invalidate, reduce or

otherwise impair DIP Lender's claims or claim priority status; filing of pleadings by the Debtors affecting the priority claim status of DIP Lender's claims, invalidation or subordination of the priority claim status, the confirmation of a plan which does not contain a provision for payment in full in cash of all obligations of the Debtors to DIP Lender; filing of a motion by the Debtors requesting, or entry of an order granting, any super-priority claim which is senior to the DIP Lender's claims, *except that* the Debtors may borrow against accounts receivable as expressly set forth in the DIP Credit Agreement.  Each of the Event of Default provisions in the DIP Credit Agreement are expressly approved upon entry of this Interim and Final DIP Order.

11.    The DIP Credit Agreement provides that the final maturity date (the "***Termination Date***") shall be the earliest of the following:  (a) December 31, 2017; (b) the effective date of a confirmed plan of reorganization; (c) acceleration by Lender of the Obligations due to the occurrence of an Event of Default; (d) the indefeasible payment in full of all Obligations owing under the DIP Facility; or (e) upon conversion or dismissal of the bankruptcy case.

12.    The Debtors' pre-petition secured lender, M&T Bank, has consented to allow a subordinated second-lien in favor of the DIP Lender to be placed on the Debtors' real property at 2101 Pennsylvania Avenue, Fort Washington, PA (as more particularly described in Exhibit 2 hereto, the "***Fort Washington Campus***") to secure the DIP Facility and as otherwise set forth in the terms and conditions in the DIP Credit Agreement and this Interim Order. The terms of such second lien position are further set forth in that certain Subordination Agreement, in substantially the form attached hereto as Exhibit 3 (the "Subordination Agreement"),  which shall be entered into by and between M&T Bank, the Debtors and the DIP Lender, contemporaneously with the DIP Credit Agreement .

6

13.     Based on the record before the Court, the terms of the Post-petition Financing Documents, pursuant to which the DIP Loan, advances and other credit and financial accommodations will be made or provided to the Debtors by the DIP Lender, in each case have been negotiated at arm's length and in "good faith," as that term is used in section 364(e) of the Bankruptcy Code, and are in the best interests of the Debtors and their estates, creditors, and parties in interest.  The DIP Lender is extending the DIP Facility to the Debtors in good faith, and the DIP Lender is entitled to the benefits of the provisions of section 364(e) of the Bankruptcy Code.

14.     It is in the best interests of the Debtors' estates that they be allowed to finance their operations under the terms and conditions set forth herein and in the Post-petition Financing Documents.  The relief requested by the Motion is necessary to avoid immediate and irreparable harm to the Debtors' estate, and good, adequate and sufficient cause has been shown to justify the granting of the relief requested herein, and the immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(c).

**NOW, THEREFORE, IT IS HEREBY ORDERED**:

1.     **Motion Granted.**  The Motion is granted on the terms and conditions set forth herein.  Any objections to the relief sought in the Motion that have not been previously resolved or withdrawn are hereby overruled on their merits or, to the extent applicable, deferred until the hearing on the Final Order.  This Interim Order shall become effective immediately upon its entry.  To the extent the terms of the other Post-petition Financing Documents differ in any material respect from the terms of this Interim Order, this Interim Order shall control.

2.     **DIP Credit Agreement.**  The Debtors are hereby (i) authorized to enter into the DIP Credit Agreement, substantially in the form filed with the Court as Exhibit B to the Motion,

7

119665724_1

and the other Post-petition Financing Documents, and (ii) authorized to borrow up to the aggregate principal amount of $1,500,000 subject to Section 2.1 of the DIP Credit Agreement and otherwise in accordance with the terms and conditions of the Post-petition Financing Documents. All obligations owed to the DIP Lender under, or in connection with, the Post-petition Financing Documents, including, without limitation, all loans, advances, letters of credit and other indebtedness, obligations, and amounts (contingent or otherwise) owing from time to time under or in connection with the Post-petition Financing Documents, and any and all other obligations at any time incurred by any of the Debtors to the DIP Lender, are defined and referred to herein as the "***DIP Obligations***."

3.    **Conditions Precedent.**    The DIP Lender shall have no obligation to lend under the DIP Credit Agreement unless and until the conditions set forth in the DIP Credit Agreement have been satisfied or waived in accordance with the DIP Credit Agreement, including, without limitation: (i) assumption of the DIP Lender's lease, (ii) approval by the Board of Directors of DIP lender, and (iii) completion of due diligence.

4.    **Conditions Subsequent.**    Delivery of an acceptable appraisal concluding that the value of the Fort Washington campus is not less than $9,350,000.

5.    **Interim Borrowing.**    The Debtors are authorized to borrow up to the Interim Amount in accordance with the Budget attached hereto as Exhibit 1, on an interim basis through and including the date of the Final Order.

6.    **Binding Effect.**    Upon execution and delivery of the Post-petition Financing Documents, the Post-petition Financing Documents shall constitute valid and binding obligations of the Debtors, enforceable against the Debtors in accordance with their terms; *provided, however*, that notwithstanding any other provision of this Interim Order or of the other Post-

8

petition Financing Documents, the Debtors shall not incur DIP Obligations in the principal amount of more than the Interim Amount. No obligation, payment, or transfer under this Interim Order or the other Post-petition Financing Documents shall be stayed, restrained, voided or recovered under the Bankruptcy Code or any applicable non-bankruptcy law, or subjected to any defense, reduction, setoff, recoupment or counterclaim.

7.    **Use of Lender Funds.**  The Debtors may use the loans or advances made under, or in connection with, the Post-petition Financing Documents solely as provided in this Interim Order and in the Post-petition Financing Documents.  From and after the Petition Date, amounts loaned and advanced under, or in connection with, the Post-petition Financing Documents shall not, directly or indirectly, be used to pay expenses of the Debtors or otherwise disbursed except (a) as provided in this Interim Order and in the Post-petition Financing Documents; (b) to fund working capital requirements and capital expenditures of the Debtors in the ordinary course and other items in accordance with the terms of the Budget, including fees and expenses of attorneys and financial advisors or other professional of the Debtors and any committee duly retained pursuant to sections 327 and 1103 of the Bankruptcy Code (including, without limitation, a claims and noticing agent), which have been allowed by the Court, but only to the extent such fees and expenses are provided in the Budget during the administration of the Chapter 11 Case (the "*Professional Fees*"); (c) to fund the payment of interest accrued on the M&T Bank pre-petition credit facilities; and (d) to fund the payment of interest accrued on the DIP Loans; *provided*, *however*, that the foregoing shall not be construed as consent to the allowance of any of the Professional Fees referred to above and shall not affect the right of any party in interest to object to the allowance and payment of any such fees and expenses of professionals.

119665724_1

8.    **Interest.**  Interest on the DIP Obligations shall accrue at the rates and be paid in accordance with the terms and provisions of the Post-petition Financing Documents.

9.    **Grant of Security Interest and Waiver of Recordation.**  The DIP Lender is granted a second priority, fully subordinated mortgage lien on the Fort Washington Campus. The second priority subordinated lien shall constitute a valid and duly perfected security interest and mortgage lien on the Fort Washington Campus as of the Petition Date, subordinated to the mortgage lien in favor of M&T Bank, the terms of which are more fully set forth in the Subordination Agreement.  The DIP Lender shall not be required to file or serve financing statements, notices of lien or similar interests which otherwise may be required under federal or state law in any jurisdiction, or take any action, including taking possession, to validate and perfect such lien.

10.    **Acknowledgement of Lease Rights.**  The Debtors acknowledge the extent, validity and priority of the DIP Lender's prepetition lease with respect to the Fort Washington Campus and filed a motion to assume such lease on the Petition Date.

11.    **Sale or Lease of Certain Property.**  Following the Effective Date of the Plan, PHMC and Public Health Fund agree to negotiate in good faith with the DIP Lender for the sale or lease at fair market value of the premises leased by the DIP Lender and certain adjacent lands owned by the Debtors ("Disposition of Certain Property").  Nothing in this Order shall adversely impact and is without prejudice to M&T's right at any time in any forum to, inter alia:  (i) contest any attempt by the DIP Lender to credit bid with respect to Disposition of Certain Property; (ii) contest any attempt by the Debtors to accept any credit bid by DIP Lender for the rent or purchase price regarding such Disposition of Certain Property and (iii) require that any proceeds of such Disposition of Certain Property be first applied to satisfy the amounts due and owing to

10

M&T Bank under the Debtors prepetition credit facilities with M&T Bank (including any and all interest, fees and costs accruing prior to or after the Petition Date).

12.    **Indemnification.**  The Debtors will indemnify the DIP Lender and its affiliates with respect to the DIP Loan.

13.    **506(c) Waiver.**  The Debtors waive any right to surcharge the DIP Lender's collateral pursuant to 11 U.S.C. § 506(c).

14.    **Avoidance Actions**.  The Debtors shall not grant a lien on avoidance actions, if any.

15.    **Priority of DIP Obligations.**  All DIP Obligations hereby constitute, under sections 364(b) and 503(b)(1) of the Bankruptcy Code, allowed administrative expense claims (the "*Priority Claims*") against the Debtors.

16.    **Survival.**  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered:  (a) confirming any plan of reorganization in any of the Chapter 11 Case (and pursuant to section 1141(d) of the Bankruptcy Code, the Debtors hereby waive such discharge); (b) converting any of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Case or any successor case; or (d) pursuant to which this Court abstains from hearing any of the Chapter 11 Case or any successor case, provided however that priority claims or other administrative expenses shall survive only to the extent permitted by applicable law.  The terms and provisions of this Interim Order, including the claims and other protections granted to the DIP Lender pursuant to this Interim Order and/or the Post-petition Financing Documents, notwithstanding the entry of any such order, shall continue in the Chapter 11 Case, in any successor case, or

11

following dismissal of the Chapter 11 Case or any successor case, and shall maintain their priority as provided by this Interim Order until all DIP Obligations have been indefeasibly paid in full in cash and all commitments to extend credit under the DIP Facility are terminated.

17.    **DIP Lender Rights.**  Except as otherwise provided for herein, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair (a) any of the rights of the DIP Lender under the Bankruptcy Code or under any non-bankruptcy law to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of the Chapter 11 Case, conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or appointment of a chapter 11 trustee or examiner (including with expanded powers), or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans, or (b) any other rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Lender.

18.    **Releases.**    In consideration of DIP Lender providing credit and financial accommodations to the Debtors pursuant to the provisions of the DIP Credit Agreement and the Interim Order.  The Debtors on behalf of themselves, successors, and assigns (collectively, the "Releasors") shall forever release, discharge, and acquit DIP Lender and its affiliates, agents, predecessors, employees, counsel, successors, and assigns (collectively, the "Pre-Petition Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations of every kind, nature and description, including without limitation, any so-called "lender liability" claims or defenses, that Releasors had, have or hereafter can or may have against Pre-Petition Releasees as of the date hereof, in respect to events that occurred on or prior to the date hereof with respect to the DIP Loan and/or Lease.

119665724_1

19.    **Termination.**  Notwithstanding any provision of this Order or in any of the Post-petition Financing Documents, on the Termination Date (as defined in the DIP Credit Agreement), (i) the Debtors shall no longer be authorized to borrow funds or incur indebtedness under the Post-petition Financing Documents or this Interim Order or to use any of the DIP Loans already received, and (ii) any obligations of the DIP Lender to make loans or advances or issue letters of credit hereunder or under the other Postpetition Financing Documents automatically shall be terminated.

20.    **Survival After Termination.**  Notwithstanding anything herein or the occurrence of the Termination Date, all of the rights, remedies, benefits and protections provided to the DIP Lender under this Interim Order and the Post-petition Financing Documents shall survive such Termination Date.  Upon such Termination Date, the principal of and all accrued interest and fees and all other DIP Obligations shall be immediately due and payable and the DIP Lenders shall have all other rights and remedies provided in this Interim Order, the other Post-petition Financing Documents, and applicable law.

21.    **Automatic Stay Modification.**  The automatic stay provisions of section 362 of the Bankruptcy Code are hereby vacated and modified to the extent necessary to permit the DIP Lender (i) to file any documents appropriate in its discretion, (ii) assess, charge, collect, advance, deduct and receive payments, including all interest, fees, costs, and expenses permitted under the Post-Petition Financing Documents, and (iii) upon the Termination Date, with notice as provided for herein, without further order of or application to this Court, to exercise all rights and remedies provided for in the Post-petition Financing Documents or under applicable law.

13

119665724_1

22.    **No Waiver of Remedies.**    The failure or delay by the DIP Lender to seek relief or otherwise exercise its rights and remedies under this Interim Order or any other Post-petition Financing Documents shall not constitute a waiver of any of its rights.

23.    **Successor and Assigns.**    The provisions of this Interim Order shall be binding upon and inure to the benefit of each of the DIP Lender and the Debtors and their respective successors and assigns (including any trustee or fiduciary hereafter appointed or elected as a legal representative of any of the Debtors, its estate, or with respect to the property of any of its estate) whether in the Chapter 11 Case, in any successor case, or upon dismissal of any such chapter 11 or chapter 7 case.

24.    **Additional Assurances.**    The Debtors are authorized and directed to do and perform all acts to make, execute and deliver all instruments and documents, and shall pay fees and expenses that may be required or necessary for the Debtors' performance under the Post-petition Financing Documents, including, without limitation, (i) the execution of the Post-petition Financing Documents and (ii) the payment of any fees or other expenses described or provided in the Post-petition Financing Documents as such become due.

25.    **Limits on Lender Liability.**    Nothing in this Interim Order or in any of the Post-petition Financing Documents, or any other documents related to this transaction shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender any liability for any claims arising from any and all activities by the Debtors in the operation of its business in connection with the Debtors' post-petition restructuring efforts.

26.    **Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification of Stay of this Interim Order.**    The DIP Lender has acted in good faith in connection with this Interim Order and its reliance on this Interim Order is in good faith.  Based on the findings set

14

forth in this Interim Order and the record made during the Interim Hearing, and in accordance

with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this

Interim Order are hereafter modified, amended or vacated by a subsequent order of this Court or

any other court, the DIP Lender is entitled to the protections provided in section 364(e) of the

Bankruptcy Code.  Any such modification, amendment or vacatur shall not affect the validity

and enforceability of any advances previously made or made hereunder, or any claim or priority

authorized or created hereby.  Any claims or priorities granted to the DIP Lender hereunder

arising prior to the effective date of any such modification, amendment or vacatur of this Interim

Order shall be governed in all respects by the original provisions of this Interim Order, including

entitlement to all rights, remedies, privileges and benefits granted herein.

27.   **Debtors' Waivers.**  At all times during this Case, and whether or not an Event of

Default has occurred, absent consent of the DIP Lender, the Debtors waive any right that they

may have to seek further authority to challenge the application of any payments authorized by

the Interim Order pursuant to section 506(b) of the Bankruptcy Code, to propose, support or have

a plan of reorganization or liquidation that does not provide for the indefeasible payment in cash

in full and satisfaction of all Post-Petition Obligations on the effective date of such plan in

accordance with the terms and conditions set forth in the DIP Agreement, provided however, that

the DIP Lender may otherwise consent in writing, but no such consent shall be implied from any

other action, inaction, or acquiescence by DIP Lender.

28.   **No Third Party Rights.**  Except as explicitly provided for herein, this Interim

Order does not create any rights for the benefit of any third party, creditor, equity holder, or any

other direct, indirect or incidental beneficiary.

119665724_1

29.    **No Waiver of Third Party Rights.**    Nothing in this Interim Order shall be deemed to waive or impair any the rights of any third party.  All such third party rights are reserved except to the extent expressly provided herein.

30.    **Reporting.**    The Debtors shall keep books and records of original entry current and updated, so that all business activity is posted to them in the ordinary course of the Debtors' business.  The Debtors shall provide to the DIP Lender the reports of operations required to be provided by the DIP Credit Agreement, if any, at the same time and in the same manner as set forth therein.

31.    **Notice of Final Hearing.**    The Debtors shall promptly serve by United States mail, first class postage prepaid, copies of the Motion, this Interim Order and a notice of the Final Hearing (the "*Final Hearing Notice*") to be held on [*July 26*___, 2017 at [*11:00 a*.m.] to consider entry of the Final Order on the following: (a) the U.S. Trustee; (b) DIP Lender; (c) the Internal Revenue Service; (d) the thirty (30) largest unsecured creditors, and (e) M&T Bank.

32.    Copies of the Motion, this Interim Order and the Final Hearing Notice also shall be served upon all persons requesting service of papers pursuant to Bankruptcy Rule 2002 by United States mail, first class postage prepaid promptly following the receipt of such request. The Final Hearing Notice shall state that any party in interest objecting to the entry of the Final Order shall file written objections with the Court no later than 4:00 p.m. on [*July 24*___, 2017], which objections shall be served so that the same are received on or before such date and time by: (a) counsel for the Debtors, Dilworth Paxson LLP, 1500 Market Street, Suite 3500E, Philadelphia, PA, 19102, Attn:  Lawrence G. McMichael; (b) the Office of the U.S.

16

Trustee; and (c) counsel to the DIP Lender; Flaster Greenberg, P.C., 1835 Market Street, Suite 1050, Philadelphia, PA 19103, Attn: William J. Burnett.

33.    **Waiver of Any Applicable Stay.**  Any applicable stay is hereby waived and shall not apply to this Interim Order.

34.    **Finding of Fact and Conclusion of Law.**  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Rule 7052 of the Bankruptcy Rules and shall take effect and be fully enforceable immediately upon execution hereof.

35.    **Jurisdiction.**  The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

**SO ORDERED** by this Court this _____ day of July, 2017.

_____
United States Bankruptcy Judge

17

## **EXHIBIT 1**

(Budget)

**Wordsworth Academy**
Cash Flow Forecast & Actuals

| | Actual W/E 06/10/17 | Actual W/E 06/17/17 | Actual W/E 06/24/17 | Forecast W/E 07/01/17 | Forecast W/E 07/08/17 | Forecast W/E 07/15/17 | Forecast W/E 07/22/17 | Forecast W/E 07/29/17 | Forecast W/E 08/05/17 | Forecast W/E 08/12/17 | Forecast W/E 08/19/17 | Forecast W/E 08/26/17 | Forecast W/E 09/02/17 | Forecast W/E 09/09/17 | Forecast W/E 09/16/17 | Forecast W/E 09/23/17 | Forecast W/E 09/30/17 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Deposits** | | | | | | | | | | | | | | | | | |
| CBH / Other MCOs | 288,785 | 68,868 | 281,715 | 50,000 | 275,000 | 50,000 | 300,000 | 50,000 | 275,000 | 50,000 | 300,000 | 50,000 | 275,000 | 50,000 | 300,000 | 50,000 | 275,000 |
| PA DOE | | | | 643,130 | | | | 657,922 | | | | 657,922 | | | | | 657,922 |
| DHS - Regular & CUA Payments | 17,979 | 56,775 | 330,455 | 30,000 | 100,000 | 30,000 | 30,000 | 30,000 | 100,000 | 30,000 | 30,000 | 30,000 | 100,000 | 30,000 | 30,000 | 100,000 | 30,000 |
| DHS - CUA | | 4,085,793 | | 413,363 | | | | 4,000,000 | | | | 1,500,000 | | | | | |
| SD of Philadelphia | | | | 294,390 | 319,480 | 13,000 | | | | 159,740 | 192,850 | 258,825 | | | | | |
| Other MH4 School Districts | 16,238 | 34,388 | 40,980 | 100,000 | 70,000 | 70,000 | 70,000 | 90,000 | 70,000 | 70,000 | 70,000 | 90,000 | 70,000 | 70,000 | 70,000 | 90,000 | 70,000 |
| Acute Partial Hospital | | | | | | | | | | | | | | | | | |
| Term Debt Proceeds | | | | | | 1,500,000 | | | | | | | | | | | |
| Misc Deposits | 113,582 | 33,725 | 2,000 | 41,000 | 10,000 | 30,000 | 10,000 | 30,000 | 10,000 | 30,000 | 10,000 | 30,000 | 10,000 | 30,000 | 10,000 | 30,000 | 10,000 |
| **Total Deposits** | 436,584 | 4,379,549 | 655,150 | 1,516,520 | 756,563 | 569,480 | 1,923,000 | 937,921 | 6,385,000 | 409,740 | 602,850 | 438,825 | 2,612,922 | 180,000 | 410,000 | 250,000 | 1,042,922 |

| | 5/26-6/30 | | 6/13-6/24 | | 6/25-7/8 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Disbursements** | | | | | | | | | | | | | | | | | |
| Payroll | (1,006,000) | | (997,124) | (850,000) | | (950,000) | | (935,854) | | (935,854) | | (935,854) | | (926,454) | | (926,454) | |
| 401(k) Payment | | (13,291) | | (14,000) | | | (14,000) | | (14,000) | | (14,000) | | (14,000) | | (14,000) | | (14,000) |
| Credit Cards (M&T) | | (19,523) | | | | | | | | | | | | | | | |
| Debit Cards (TD Bank) | (608) | | | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) |
| FSA Transfer | (2,000) | (6,014) | | (4,000) | (2,000) | (2,000) | (2,000) | (6,000) | (2,000) | (2,000) | (2,000) | (10,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) |
| Employee Expenses | (27,334) | (25,296) | (30,648) | (40,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) |
| Petty Cash | (5,964) | (8,475) | | (10,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) |
| Foster Care | (16,321) | (35,255) | (34,750) | (72,000) | | (36,000) | (36,000) | (36,000) | (36,000) | (36,000) | (36,000) | (36,000) | (36,000) | (36,000) | (36,000) | (36,000) | (36,000) |
| CUA Subcontractors | (7,671) | (536,141) | (1,433,276) | | | (750,000) | (1,000,000) | (750,000) | (1,000,000) | (750,000) | (500,000) | (500,000) | (500,000) | (500,000) | (500,000) | (500,000) | |
| Benefits | (18,220) | (39,763) | (282,127) | (30,000) | | | (10,000) | (294,500) | | | (30,000) | (294,500) | | | (10,000) | | (294,500) |
| Insurance | (64,467) | (152,821) | (37,666) | | | (235,000) | | | | | (235,000) | | | | (235,000) | | |
| Operating | (73,286) | (113,834) | (38,264) | (100,000) | (100,000) | (100,000) | (100,000) | (151,000) | (100,000) | (100,000) | (100,000) | (100,000) | (100,000) | (100,000) | (100,000) | (100,000) | (100,000) |
| Acute Partial Hospital Expenses | | | | (238,100) | | | | | (306,600) | | | | (306,600) | | | | |
| Rent | (43,926) | (48,922) | (49,287) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) |
| Staffing | (30,562) | (43,910) | (872) | (5,000) | (15,000) | (47,000) | (5,000) | (5,000) | (5,000) | (5,000) | (47,000) | (5,000) | (5,000) | (5,000) | (47,000) | (5,000) | (5,000) |
| Utilities | (8,173) | (5,850) | (5,510) | (2,325) | (2,325) | (2,325) | (2,325) | (2,325) | (2,325) | (2,325) | (2,325) | (2,325) | (2,325) | (2,325) | (2,325) | (2,325) | (2,325) |
| Professional | | | | | | | | | | | | | | | | | |
| **Total Operating Disbursements** | (1,304,531) | (1,049,217) | (2,989,523) | (1,199,825) | (454,825) | (2,209,825) | (1,251,825) | (2,257,179) | (1,343,425) | (1,668,679) | (1,028,825) | (1,961,179) | (443,425) | (1,659,279) | (1,023,825) | (1,654,279) | (531,325) |

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Net Operating Cash Flow** | (867,950) | 3,330,332 | (2,254,374) | (41,305) | 363,438 | (1,640,345) | 671,175 | (1,419,257) | 3,041,575 | (1,258,939) | (425,975) | (1,522,354) | 1,769,497 | (1,479,279) | (613,825) | (1,404,279) | 511,597 |
| **Non-Operating and Restructuring Disbursements** | | | | | | | | | | | | | | | | | |
| Term Loan (P&I) | | | | | (19,000) | | | (19,000) | | | | | (19,000) | | | | |
| LOC Interest / Bank Fees | (2,411) | | | | | (2,500) | | | | (2,500) | | | | | (2,500) | | |
| New Term Debt Interest | | | | | | | | | (4,375) | | | | (8,750) | | | | |
| New LOC Interest | | | | | | | | | (2,058) | | | | (857) | | | | |
| New Bank Fees | | | | (100,000) | | | | | | (100,000) | | | (2,033) | | | | |
| Professional Fees - Restructuring | (17,500) | (145,000) | (50,000) | (115,000) | | (5,000) | | | | (5,000) | | (265,000) | | | | | (290,000) |
| PHMC Management Fee | | | | | | | | | | | | (117,117) | | | | | (117,117) |
| Trustee Fees | | | | | | | | | | | | | | | | | |
| **Total Non-Operating & Chap 11 Disb** | (19,911) | (145,000) | (50,000) | (215,000) | (19,000) | (7,500) | - | - | (25,433) | (107,500) | - | (382,127) | (30,640) | - | (2,500) | - | (407,127) |
| **Total Disbursements** | (1,324,444) | (1,194,217) | (2,939,523) | (1,414,825) | (453,925) | (2,217,325) | (1,251,825) | (2,257,179) | (1,368,858) | (1,776,179) | (1,028,825) | (2,343,306) | (874,065) | (1,659,279) | (1,026,325) | (1,654,279) | (938,452) |
| **Weekly Net Cash Flow** | (887,860) | 3,085,332 | (2,304,574) | (256,305) | 344,438 | (1,647,845) | 671,175 | (1,419,257) | 3,016,142 | (1,366,439) | (425,975) | (1,904,481) | 1,738,857 | (1,479,279) | (616,325) | (1,404,279) | 104,470 |
| **W/E Balance** | 970,061 | 4,055,393 | 1,751,020 | 1,494,715 | 1,839,153 | 191,308 | 862,483 | (556,773) | 2,459,369 | 1,092,930 | 666,955 | (1,237,526) | 501,331 | (977,948) | (1,594,273) | (2,998,552) | (2,894,082) |

| **Benefits - Detail** | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| INDEPENDENCE BLUE CROSS | | | (25,378) | | | | | | | | | | | | | | |
| KEYSTONE HEALTH PLAN EAST | | | (203,222) | | | | | (277,000) | | | | | (277,000) | | | | (277,000) |
| ACSA-ASSOC. OF COMMUNITY SERV. AGENCIES | | (17,172) | | | | | | (17,500) | | | | | (17,500) | | | | (17,500) |
| KX BENEFITS | (18,220) | (13,609) | (53,726) | (30,000) | | | | | | | | | | | | | |
| Provident Life & Accident Ins Co | | (8,981) | | | | | (10,000) | | | | | (10,000) | | | | (10,000) | |
| **Total** | (18,220) | (39,763) | (282,127) | (30,000) | - | - | (10,000) | (294,500) | - | - | (10,000) | (294,500) | - | - | (10,000) | - | (294,500) |

| **Professionals - Detail** | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DANEKER, DAVID ESQUIRE | (7,500) | | | | | (5,000) | | | | (5,000) | | | | | | | (15,000) |
| DONLIN RECANO | (10,000) | | | | | | | | | | | (15,000) | | | | | (15,000) |
| GETZLER HENRICH | | (45,000) | | (60,000) | | | | | | | | (100,000) | | | | | (75,000) |
| DILWORTH PAXSON LLP | | (100,000) | (50,000) | (50,000) | | | | | | | | (150,000) | | | | | (150,000) |
| Creditor Committee Professionals | | | | | | | | | | | | | | | | | (50,000) |
| **Total** | (17,500) | (145,000) | (50,000) | (115,000) | - | (5,000) | - | - | - | (5,000) | - | (265,000) | - | - | - | - | (290,000) |

| **Accounts Receivable** | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Credible New Billings | 392,393 | 252,603 | 160,059 | 248,828 | 308,647 | 365,082 | 352,782 | 439,806 | 352,561 | 180,158 | 153,367 | 150,413 | 305,239 | 341,583 | 402,919 | 425,053 | 392,982 |
| Other New Billings | 4,747,062 | 38,345 | 413,363 | 16,121 | 713,301 | 4,015,000 | | 16,121 | 713,301 | 15,000 | 1,500,000 | 117,650 | 713,301 | 15,000 | 1,500,000 | 16,121 | 66,142 |
| **Total New Billings** | 5,139,455 | 290,948 | 573,422 | 264,949 | 1,021,943 | 4,380,082 | 352,782 | 455,928 | 1,065,862 | 195,158 | 1,653,367 | 268,063 | 1,018,540 | 356,583 | 1,902,919 | 441,174 | 459,124 |
| Credible Adjustments | (1,474) | (4,286) | (5,359) | (77,293) | (1,227) | (3,972) | (2,452) | (19,272) | (12,698) | (1,175) | (1,662) | (10,832) | (1,081) | (2,373) | (2,248) | (1,082) | (39,834) |
| Other Adjustments | | | | | | | | | | | | | | | | | |
| **Total Adjustments** | (1,474) | (4,286) | (5,359) | (77,293) | (1,227) | (3,972) | (2,452) | (19,272) | (12,698) | (1,175) | (1,662) | (10,832) | (1,081) | (2,373) | (2,248) | (1,082) | (39,834) |
| **Total Payments** | 358,002 | 4,280,258 | 634,350 | 1,138,020 | 793,363 | 554,480 | 418,000 | 832,922 | 4,380,000 | 394,740 | 597,850 | 433,825 | 2,607,922 | 165,000 | 405,000 | 245,000 | 1,037,922 |
| **AR Balance** | 8,946,943 | 4,955,347 | 4,889,260 | 3,938,695 | 4,166,249 | 7,987,879 | 7,920,209 | 7,503,941 | 4,177,105 | 3,976,348 | 5,030,203 | 4,853,628 | 3,263,165 | 3,452,334 | 4,948,045 | 5,143,138 | 4,524,505 |

| **Line of Credit Availability** | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Accounts Receivable - Gross | 8,946,943 | 4,955,347 | 4,889,260 | 3,938,695 | 4,166,249 | 7,987,879 | 7,920,209 | 7,503,941 | 4,177,105 | 3,976,348 | 5,030,203 | 4,853,628 | 3,263,165 | 3,452,334 | 4,948,045 | 5,143,138 | 4,524,505 |
| Less: Ineligibles | (1,217,056) | (673,927) | (664,939) | (535,690) | (566,650) | (1,086,351) | (1,077,548) | (1,020,536) | (568,066) | (540,783) | (684,108) | (660,093) | (443,790) | (469,523) | (672,934) | (699,467) | (615,333) |
| Accounts Receivable - Net | 7,731,887 | 4,281,420 | 4,224,321 | 3,403,206 | 3,599,639 | 6,901,527 | 6,843,060 | 6,483,405 | 3,609,038 | 3,435,564 | 4,346,095 | 4,193,535 | 2,819,374 | 2,982,851 | 4,275,111 | 4,443,671 | 3,909,172 |
| Advance Rate - 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% |
| Availability | 6,185,509 | 3,425,136 | 3,379,457 | 2,722,565 | 2,879,711 | 5,521,222 | 5,474,448 | 5,186,724 | 2,887,215 | 2,748,451 | 3,476,876 | 3,354,828 | 2,255,500 | 2,386,281 | 3,420,089 | 3,554,937 | 3,127,338 |

| **Line of Credit** | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Opening Balance | | | | | | | | | | | | | 1,237,526 | | | 1,594,273 | 2,998,552 |
| Advances | 1,324,444 | 1,194,217 | 2,939,523 | 1,414,825 | 453,925 | 2,217,325 | 1,251,825 | 2,257,179 | 1,368,858 | 1,776,179 | 1,028,825 | 2,343,306 | 874,065 | 1,659,279 | 1,026,325 | 1,654,279 | 938,452 |
| Repayments | 436,584 | 4,379,549 | 635,150 | 1,158,520 | 798,363 | 569,480 | 1,923,000 | 837,922 | 4,385,000 | 409,740 | 602,850 | 438,825 | 2,612,922 | 180,000 | 410,000 | 250,000 | 1,042,922 |
| Adjustments | (887,860) | 3,085,332 | (2,304,374) | (256,305) | 344,438 | (1,647,845) | 671,175 | (1,419,257) | 3,016,142 | (1,366,439) | (425,975) | 666,955 | 501,331 | (1,479,279) | 977,948 | | |
| Ending Balance | | | | | | | | | | | | 1,237,526 | | | 1,594,273 | 2,998,552 | 2,894,082 |
| **Excess/(Deficit) Availability** | 6,185,509 | 3,425,136 | 3,379,457 | 2,722,565 | 2,879,711 | 5,521,222 | 5,474,448 | 5,186,724 | 2,887,215 | 2,748,451 | 3,476,876 | 2,117,302 | 2,255,500 | 2,386,281 | 1,825,816 | 556,385 | 233,256 |

| **Professional Fees - Restructuring** | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Weekly Expense: | | | | | | | | | | | | | | | | | |
| DANEKER, DAVID ESQUIRE | 7,500 | | | | | | | | | 5,000 | | | | | | | |
| DONLIN RECANO | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| GETZLER HENRICH | 22,500 | 22,500 | 22,500 | 22,500 | 15,000 | 20,000 | 20,000 | 35,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| DILWORTH PAXSON LLP | 50,000 | 50,000 | 50,000 | 50,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 30,000 | 30,000 | 25,000 | 25,000 | 25,000 | 25,000 | 20,000 | 20,000 |
| Creditor Committee Professionals | | | | | | | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 10,000 | 10,000 |
| **Total Weekly Expense** | 80,000 | 77,500 | 77,500 | 77,500 | 60,000 | 70,000 | 80,000 | 95,000 | 75,000 | 70,000 | 65,000 | 60,000 | 60,000 | 60,000 | 60,000 | 50,000 | 45,000 |
| Payments: | | | | | | | | | | | | | | | | | |
| DANEKER, DAVID ESQUIRE | 7,500 | | | | | 5,000 | | | | 5,000 | | | | | | | 15,000 |
| DONLIN RECANO | 10,000 | | | | 5,000 | | | | | | 15,000 | | | | | | 15,000 |
| GETZLER HENRICH | | 45,000 | | 60,000 | | | | | | | 100,000 | | | | | | 75,000 |
| DILWORTH PAXSON LLP | | 100,000 | 50,000 | 50,000 | | | | | | | 150,000 | | | | | | 150,000 |
| Creditor Committee Professionals | | | | | | | | | | | | | | | | | 50,000 |
| **Total Payments** | 17,500 | 145,000 | 50,000 | 115,000 | - | 5,000 | - | - | - | 5,000 | - | 265,000 | - | - | - | - | 290,000 |
| **Accrued Outstanding Amount** | (80,000) | (127,500) | (100,000) | (137,500) | (77,500) | (12,500) | 67,500 | 162,500 | 217,500 | 282,500 | 347,500 | 142,500 | 202,500 | 232,500 | 307,500 | 392,500 | 112,500 |

**Assumptions**

Debit Card Activity will increase due to
Credit Cards being shut down

Petty Cash Activity will increase due to
Credit Cards being shut down

**EXHIBIT 2**

(Legal Description – Fort Washington Campus)

119665724_1



## **EXHIBIT 3**

(Subordination Agreement)

2

## SUBORDINATION AGREEMENT

**THIS SUBORDINATION AGREEMENT** (this "<u>Agreement</u>") is made as of July 7, 2017, by and between M&T BANK, a New York banking corporation ("<u>Senior Lender</u>" or "<u>M&T</u>"), and Play and Learn, a Pennsylvania non-profit corporation t/a Learn and Play ("<u>Subordinate Lender</u>").

## RECITALS

WHEREAS, on or around April 8, 2015, Senior Lender made available to Wordsworth Academy, a Pennsylvania corporation ("<u>Wordsworth</u>"), Wordsworth CUA 5, LLC, a Pennsylvania limited liability company ("<u>CUA 5</u>"), and Wordsworth CUA 10, LLC, a Pennsylvania limited liability company ("<u>CUA 10</u>" and together with Wordsworth and CUA 5, "<u>Borrower</u>" or "<u>Debtor</u>"), among other things, a term loan in the original principal amount of $6,000,000 (the "<u>Term Loan</u>") and a line of credit in the original principal amount of $4,000,000, as subsequently increased to $5,000,000 (the "<u>Line of Credit</u>" and together with the Term Loan, the "<u>M&T Loans</u>");

WHEREAS, pursuant to a certain Mortgage dated April 8, 2015, in the original principal amount of $10,000,000 (the "<u>Mortgage</u>"), to secure all of Borrower's present and future indebtedness due and owing to M&T, Wordsworth granted M&T first priority liens on and security interests in, among other things, certain real property owned by Wordsworth, commonly known as:  (i) 100 Camp Hill Road, partly in Springfield Township and partly in Upper Dublin Township, Montgomery County, Pennsylvania (being known as Parcel Numbers 52-00-14044-007 and 54-00-03541-00-5); and (ii) Wenner Way, Upper Dublin Township, Montgomery County, Pennsylvania (being known as Parcel Number 54-00-03552-00-3) (the "<u>Real Property</u>"). The Mortgage was recorded in the office of the Recorder of Deeds for Montgomery County Pennsylvania on April 10, 2015, as Instrument Number: 2015024142, in Mortgage Book 13926, at pages 02908-02926;

WHEREAS, on June 30, 2017 (the "<u>Petition Date</u>"), each Borrower filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101, et seq. (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Eastern District of Pennsylvania ("<u>Bankruptcy Court</u>"), commencing bankruptcy case numbers 17-14463, 17-14466, and 17-14467 (collectively, the "<u>Bankruptcy Cases</u>");

WHEREAS, as of the Petition Date, the outstanding principal balance due and owing to M&T under the Term Loan was $4,700,000 and under the Line of Credit was $0.00;

WHEREAS, on the Petition Date, the Borrower filed a motion seeking authority to obtain debtor in possession financing, in the amount of $1,500,000 from Subordinate Lender (the "<u>DIP Facility</u>");

WHEREAS, the Subordinate Lender has conditioned the making of the DIP Facility on, among other things, Wordsworth granting the Subordinate Lender a subordinated, second priority lien on and security interest in the Real Property;

WHEREAS, on July 6, 2017, the Bankruptcy Court entered an interim order conditionally approving the Borrower's request for authority to enter into the DIP Facility, secured by a fully subordinated, second priority lien on and security interest in the Real Property (the "Interim DIP Financing Order"); and

NOW, THEREFORE, in consideration of the foregoing Recitals, and of the mutual agreements herein contained, the Parties intending to be legally bound hereby, agree as follows:

1.      **Lien Subordination.**  M&T asserts that it has valid, properly perfected first priority liens on and security interests in and to the Real Property, securing the M&T Loans and that, as of the date of this Agreement the total principal balance due and owing to M&T under the M&T Loans is $4,700,000. Subordinated Lender acknowledges and agrees that any and all liens, security interests or encumbrances on the Real Property in favor of the Subordinate Lender to secure the DIP Facility, and all collateral documents in connection therewith, and all modifications, amendments, consolidations thereto, and all rights of Subordinate Lender to receive insurance proceeds and condemnation awards in connection therewith, are subordinated and made junior to all liens, security interests or encumbrances of M&T in any and all assets and property of Borrower, whether real or personal, tangible or intangible, wherever located, and whether now owned or hereafter acquired.  This subordination is effective notwithstanding (i) the priorities that would ordinarily result from the order of granting or attaching or the order of filing or recording any financing statement, deed or other instrument (or any failure to do so); and (ii) the bankruptcy, reorganization or other insolvency proceeding of Borrower..

2.      **Limited Standstill: Limitation on Subordinate Lender's Rights**.  Notwithstanding Subordinate Lender's rights to the contrary under applicable law, any provision of the documents executed in connection with the DIP Facility, the Interim Order or any other Bankruptcy Court order concerning the DIP Facility  (including a final order with respect to the DIP Facility), Subordinate Lender hereby acknowledges and agrees that it shall not take any action to enforce any default or event of default ("Enforcement Action") against the Debtors until the earlier to occur of:  (i) satisfaction in full of the M&T Loans (including all principal, interest, fees and costs due and owing to M&T in connection therewith); or (ii) ninety (90) days after giving M&T Bank notice of the occurrence of such default or event of default.  Subordinate Lender waives any right it may have to assert that M&T should marshal assets subject to a lien securing the M&T Loans. Provided however that nothing in this paragraph or this Subordination Agreement shall impair, limit, delay or prejudice any rights or remedies of the Subordinate Lender to enforce and prosecute any and all rights or any Enforcement Action that it may have against Public Health Fund with respect to that certain Guaranty Agreement, by and between the Debtor, Public Health Fund and the DIP Lender (the "Guaranty Agreement").

3.      **Non-Interference by Subordinate Lender**.  Until such time as Subordinate Lender is permitted to take an Enforcement Action in accordance with the terms of Section 2 of this Agreement, Subordinate Lender shall not institute any judicial or administrative proceeding against Borrower, and, in all events Subordinate Lender shall not take or institute any action,

which directly or indirectly would interfere with or delay the exercise by M&T of its rights and remedies in respect of the Real Property or any part thereof, or any other property securing the M&T Loans, including, without limitation, any efforts by M&T to obtain relief from the automatic stay under Section 362 of the United States Bankruptcy Code.  Provided however that nothing in this paragraph or this Subordination Agreement shall impair, limit, delay or prejudice any rights or remedies of the Subordinate Lender to enforce and prosecute any and all rights or any Enforcement Action that it may have against Public Health Fund with respect to the Guaranty Agreement.

4.     **Notice of Defaults**.  Subordinate Lender agrees to provide M&T notice of any default or event of default by Borrower of any of Borrower's obligations to Subordinate Lender under the DIP Facility.  Any notice or demand hereunder or under any applicable law pertaining hereto shall be in writing and such notice or demand shall be deemed sufficiently given for all purposes when delivered (i) by personal delivery and shall be deemed effective when delivered, or (ii) by mail or courier and shall be deemed effective three (3) business days after deposit in an official depository maintained by the United States Post Office for the collection of mail or one (1) business day after delivery to a nationally recognized overnight courier service (e.g., Federal Express), to the addresses set forth below:

ADDRESS FOR NOTICE TO SUBORDINATE LENDER

**Play and Learn**
**c/o Gerald Schatz**
**200 Camp Hill Road**
**Fort Washington, PA 19034**

**With a copy to:**

**William J. Burnett**
**Flaster/Greenberg, PC**
**1835 Market Street, Suite 1050**
**Philadelphia, PA 19103**

ADDRESS FOR NOTICE TO M&T

M&T Bank
Attention: Irene Novack
797 E. Lancaster Avenue
Villanova, PA 19085

With a copy to:

Peter S. Clark, II, Esq.
Jennifer P. Knox, Esq.
Reed Smith LLP

- 3 -

Three Logan Square, Suite 3100
1717 Arch Street
Philadelphia, PA 19103.

Notice by e-mail is not valid notice under this or any other agreement between Subordinate Lender and M&T.

5.      **Proceeds from Sale or Other Disposition of Real Property**.  In the event of any sale or other disposition of the Real Property or award of insurance or condemnation proceeds with respect thereto, Subordinate Lender acknowledges and agrees that unless otherwise ordered by final order of the Bankruptcy Court, it is and shall not be entitled to receive any payments until such time as the M&T Loans have been fully and indefeasibly paid in full (including all principal, interest, fees and costs due and owing to M&T in connection therewith).   If Subordinate Lender receives any payments in violation of this paragraph or any other provision in this Agreement, Subordinate Lender will hold such payment in trust for M&T in the same medium in which received, will not commingle the same with any of the assets of Subordinate Lender, and will deliver the same to M&T in the form received, properly endorsed to permit collection, as soon as reasonably possible, but in any event no later than three (3) business days following the day of their receipt.  Nothing herein shall require M&T to accelerate or demand (as the case may be) payment M&T Loans or exercise any other right or remedy against Borrower or any other person in order to exercise its rights under this Agreement.

6.      **Amendment of DIP Facility Documents**.  Absent or an order of the Bankruptcy Court or the prior written consent of M&T, which consent shall not be unreasonably withheld, Subordinate Lender shall not amend or modify the documents evidencing the DIP Facility.

7.      **Authority**. M&T and Subordinate Lender each has all requisite power to enter into this Agreement and to carry out the provisions hereof and has duly authorized the execution and delivery of this Agreement.  The execution and delivery of this Agreement and the performance of the obligations hereunder do not violate any provision of law, any order, rule or regulation of any court or governmental agency or its charter, articles of incorporation, bylaws or other relevant organization documents or constitute a default under any agreement or other instrument to which it is a party or by which it is bound.  Each of M&T and Subordinate Lender has duly executed and delivered this Agreement and it constitutes a legal, valid and binding obligation enforceable against it in accordance with its terms and no consent, license, approval, or authorization of, or registration, declaration, or filing with, any court, governmental body, authority, or other person or entity is required in connection with the valid execution, delivery and performance of this Agreement, other than filings and recordings in connection with this Agreement.

8.      **Modification**.  No provision of this Agreement may be changed, waived, discharged or terminated orally, by telephone or by any other means except by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

- 4 -

9.    **Specific Performance**.  M&T is hereby authorized to demand specific performance of this Agreement at any time when Subordinate Lender shall have failed to comply with any of the provisions of this Agreement.  Subordinate Lender hereby irrevocably waives any defense based on the adequacy of a remedy at law, or any other defense which might be asserted as a bar to such remedy of specific performance.  Further, the parties acknowledge that breach of this Agreement by Subordinate Lender could cause irreparable harm to M&T for which there may be no adequate remedy at law; and, therefore, M&T is entitled to injunctive relief in the event of an anticipated or actual breach by Subordinate Lender of the terms hereof.

10.    **WAIVER OF JURY TRIAL**.  **M&T AND SUBORDINATE LENDER EACH HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ANY RIGHT TO TRIAL BY JURY SUBORDINATE LENDER OR M&T MAY HAVE IN ANY ACTION OR PROCEEDING, IN LAW OR IN EQUITY, IN CONNECTION WITH THIS AGREEMENT OR THE DOCUMENTS RELATED HERETO.  SUBORDINATE LENDER REPRESENTS AND WARRANTS THAT NO REPRESENTATIVE OR AGENT OF M&T HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT M&T WILL NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THIS RIGHT TO JURY TRIAL WAIVER.**

11.    **Governing Law, Jurisdiction and Venue**.  This Agreement has been delivered to and accepted by M&T and will be deemed to be made in the Commonwealth of Pennsylvania.  Except as otherwise provided under federal law, this Agreement will be interpreted in accordance with the laws of the Commonwealth of Pennsylvania excluding its conflict of laws rules.  **SUBORDINATE LENDER HEREBY IRREVOCABLY CONSENTS TO THE EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT IN THE COMMONWEALTH OF PENNSYLVANIA IN A COUNTY OR JUDICIAL DISTRICT WHERE M&T MAINTAINS A BRANCH AND CONSENTS THAT M&T MAY EFFECT ANY SERVICE OF PROCESS IN THE MANNER AND AT SUBORDINATE LENDER'S ADDRESS SET FORTH ABOVE FOR PROVIDING NOTICE OR DEMAND; PROVIDED THAT NOTHING CONTAINED IN THIS AGREEMENT WILL PREVENT M&T FROM BRINGING ANY ACTION, ENFORCING ANY AWARD OR JUDGMENT OR EXERCISING ANY RIGHTS AGAINST SUBORDINATE LENDER INDIVIDUALLY, AGAINST ANY SECURITY OR AGAINST ANY PROPERTY OF SUBORDINATE LENDER WITHIN ANY OTHER COUNTY, STATE OR OTHER FOREIGN OR DOMESTIC JURISDICTION.**  Subordinate Lender acknowledges and agrees that the venue provided above is the most convenient forum for both M&T and Subordinate Lender.  Subordinate Lender waives any objection to venue and any objection based on a more convenient forum in any action instituted under this Agreement.

12.    **Counterparts**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original.  Such counterparts shall constitute but one and the same instrument and shall be binding upon, and shall inure to the benefit of, each of the undersigned individually as fully and completely as if all had signed one instrument.

13.     **Successors and Assigns**.  This Agreement shall be binding upon and inure to the benefit of (a) M&T and its successors and assigns, including without limitation, any holder of the M&T Loans and (b) Subordinate Lender, and its permitted successors and assigns hereunder.

14.     **No Third Party Beneficiaries**.  Nothing contained in this Agreement shall be deemed to indicate that this Agreement has been entered into for the benefit of any person other than M&T and Subordinate Lender and their respective successors and assigns, and no other person shall be a third party beneficiary hereof.

15.     **Severability**.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

16.     **No Waiver**.  No waiver shall be deemed to be made by M&T of any of its rights hereunder, or under any documents evidencing the M&T Loans, unless the same shall be in writing and signed by M&T, and each waiver, if any, shall be a waiver only with respect to the specific instances involved and shall in no way impair the rights of M&T in any other respect or at any other time.  No waiver shall be deemed to be made by Subordinate Lender of any of its rights hereunder, or under the documents executed in connection with the DIP Facility unless the same shall be in writing and signed by Subordinate Lender, and each waiver, if any, shall be a waiver only with respect to the specific instances involved and shall in no way impair the rights of Subordinate Lender in any other respect or at any other time.

17.     **Borrower Acknowledgement and Consent**.  Each Borrower, by its execution below, hereby consents to and agrees to be bound by the terms and conditions of this Agreement to the extent applicable to them.

18.     **Survival**.  The terms of this Agreement shall survive any conversion of any of the Borrower's Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code, appointment of a trustee in any of the Bankruptcy Cases, dismissal of any of the Bankruptcy Cases.

[Remainder of this page left intentionally blank; signature pages follow.]

- 6 -

PLAY AND LEARN t/a LEARN AND PLAY

_____
Name:_____
Title: _____

M&T BANK

_____
Name:_____
Title: _____

WORDSWORTH ACADEMY

_____
Name:_____
Title: _____

WORDSWORTH CUA 5, LLC

_____
Name:_____
Title: _____

WORDSWORTH CUA 10, LLC

_____
Name:_____
Title: _____